## In re BOARD OF WATER SUPPLY OF CITY OF NEW YORK

(Supreme Court, Special Term, Ulster County. March 10, 1907.)

1. EMINENT DOMAIN—NATURE OF POWER.

The right of eminent domain is the right of the state as sovereign to take at any time private property of any citizen for public use by paying just compensation therefor. The right is inherent in all governments, but is now restricted by Const. art. 1, § 6, providing that private property shall not be taken for public use without just compensation, and the theory upon which it may be taken at all is that the right of the individual must give way to the greater rights of a majority of the subjects of the state, and that it is necessary for the public use.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 18, Eminent Domain, §§ 1, 2.

For other definitions, see Words and Phrases, vol. 3, pp. 2362–2366; vol. 8, p. 7649.]

2. SAME—COMPENSATION—CONSTITUTIONAL PROVISIONS—CONSTRUCTION—TIME.

Under Const. art. 1, § 6, providing that private property shall not be taken for public use without just compensation, the compensation to be paid the landowner is the fair and reasonable market value of his property at the time of the appropriation.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 18, Eminent Domain, §§ 332–334.]

3. SAME—VALUATION.

The compensation to be paid for the taking of private property under eminent domain is the market value of the real estate taken for its best available uses to the owner or claimant and for all purposes for which it is or reasonably may be used; but the valuation is to be taken from the standpoint of the owner, and not from that of the condemning party, who cannot be called upon to pay for advantages which may accrue by the mere reason of the property's location, unless it affects the market value.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 18, Eminent Domain, §§ 352, 353, 356.]

4. SAME—METHOD OF DETERMINING VALUE.

In determining the value of property sought to be taken by condemnation, information may be collected by the commissioners in all the ways which a prudent man usually takes to satisfy his own mind in matters of like nature where his own interests are involved; and, while they may seek light from other minds, they must eventually be governed by their own judgment in fixing an actual, and not a speculative, value.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 18, Eminent Domain, § 588.]

**5.** SAME—INJURY TO BUSINESS—BY WHOM DETERMINED—STATUTORY PROVISIONS.

Under Laws 1905, p. 2050, c. 724, § 42, as amended by Laws 1906, p. 744, c. 314, § 9, relating to the acquisition of lands, etc., for a water supply for New York City, providing that under conditions therein stated the owner of an established business on June 1, 1905, directly or indirectly decreased in value by reason of the taking, shall have the right of damages for such decreased value, and that the board of water supply may agree with such person as to the amount of damages, but, if no agreement can be made, the amount shall be determined in the manner therein provided for ascertaining the value of real estate taken, a commission appointed to determine the compensation for real estate has nothing to do with the fixing of damages for loss or decrease of business, which is the province of a separate commission or commissioners appointed for such purpose, and evidence relating to such loss or decrease of business, etc., is properly rejected by a commission appointed to fix the value of real estate only.

**6.** SAME—PROPERTY NOT DESCRIBED IN PETITION—PERSONAL PROPERTY AND BUSINESS ON PROPERTY NOT TAKEN.

In condemnation proceedings damages can be assessed only to property described in the petition, and hence evidence of damages to personal property or business still continued on property not taken cannot be considered.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 18, Eminent Domain, § 524.]

**7.** SAME—APPRAISEMENT BY COMMISSION—EFFECT OF PERSONAL INSPECTION.

Where commissioners appointed to fix the compensation for real estate taken under condemnation proceedings make a personal investigation of the premises, the fact that the value of the land as shown by the condemning party, plus the value of the buildings thereon as shown by both parties, exceeds somewhat the award made by the commission, will not necessitate setting aside the award.

**8.** SAME—NECESSITY OF SEPARATE REPORT ON LAND AND BUILDINGS.

In condemnation proceedings, commissioners appointed to fix compensation need not make a separate report on the land and the structural value of the buildings thereon, since they constitute a part of the real estate.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 18, Eminent Domain, § 598.]

**9.** SAME—COMPENSATION—STONE QUARRIES.

In condemnation proceedings the compensation should be estimated for the land as land, and not for the materials which compose it; and hence no separate report of commissioners appointed to fix compensation for the taking of real estate is necessary as to stone quarry property, for if the stone is unquarried it is real estate, and if already quarried, it is not taken, nor can an additional claim for loss of the established quarry business be maintained.

**10.** SAME—DAMAGES—EVIDENCE—ADMISSIBILITY—AFFIDAVITS—RELATIVE VALUES.

In condemnation proceedings, affidavits as to the relative values of the parcels of real estate taken in the same proceeding are incompetent, and cannot be considered, either by the commission appointed to fix compensation or by the court on appeal.

**11.** SAME—STATUTORY PROVISIONS—EFFECT—ASHOKAN RESERVOIR.

Laws 1905, p. 2028, c. 724, § 3, as amended by Laws 1906, p. 736, c. 314, § 1, relating to an additional water supply for New York City, providing that no reservoir shall at any time be constructed within the drainage area of the Esopus creek than that designated in certain reports of the mayor, chairman board of estimate and apportionment of the city of New York, as to the Ashokan Reservoir, is a restriction upon the city of New York only, and not upon the landowners, and hence does

not pre-empt the proposed Ashokan Reservoir site for the use of the city of New York.

12. WATER COURSES—NATURAL WATER COURSE—RIPARIAN RIGHTS—RUNNING WATER—"PROPERTY."

Running water in natural streams is not "property," and never was, and a riparian owner has no right to interfere with the rights of other riparian owners by a dam, so as to discontinue the flow of water, without the consent of the lower riparian owners.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 48, Waters and Water Courses, § 193.

For other definitions, see Words and Phrases, vol. 6, pp. 5693, 5728; vol. 8, pp. 7768, 7770.]

13. EMINENT DOMAIN—DAMAGES—EVIDENCE—ADMISSIBILITY.

In a hearing before commissioners appointed to fix compensation in proceedings to condemn land for the Ashokan Reservoir for a water supply for New York City, an offer to prove the natural adaptability of the property for reservoir and water supply purposes, as bearing on the market value, held properly refused, in view of the circumstances making such use impracticable under eminent domain, and the fact that the commissioners knew of such circumstances.

14. SAME—APPEAL—REVIEW—DISCRETION OF COMMISSIONERS.

In condemnation proceedings, where the evidence has all been taken before the commissioners appointed to fix compensation, and the case closed, whether the case should be opened to introduce further testimony is discretionary with the commission after the question is argued, and the courts will not interfere with such discretion, in the absence of a showing of abuse.

15. SAME—DISPOSITION OF AWARD.

Unless an award by commissioners appointed to fix compensation in condemnation proceedings is palpably excessive or inadequate, it will not be set aside on that ground, nor unless it appears that the commissioners adopted an erroneous principle in determining the amount.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 18, Eminent Domain, § 612.]

16. SAME—MEASURE OF DAMAGES—PROPERTY NOT TAKEN—NONACCESS TO HIGHWAY.

In condemnation proceedings, where part of a parcel of land is taken, so as to leave the remainder isolated from a highway, the measure of damages is the difference between the value of the entire property as it was before the taking and the value of the remainder in the condition it is left, considering any injury done by the taking, such as isolation from the highway.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 18, Eminent Domain, §§ 363–370.]

17. SAME—STATUTORY PROVISIONS—CONSTRUCTION—ASHOKAN RESERVOIR—PROPOSED NEW ROAD—EFFECT.

Laws 1905, p. 2048, c. 724, § 35, as amended by Laws 1906, p. 741, c. 314, § 6, relating to New York City water supply, provides that the city of New York is hereby required to build and construct such highways as may be made necessary by the construction of any reservoir under this act, etc. The map filed in proceedings for the condemnation of the Ashokan Reservoir showed a proposed road which would give access to certain property not taken. Held, that the statute did not provide that the road should be made around the taking line of the reservoir, and, as the city might conclude to put it elsewhere than as indicated on the map, in determining the damages for the taking of the parcel in question, evidence that, if there was a public highway running along the portion not taken, the value would be much greater than that testified to in the condition it would be left by the taking of the parcel actually taken, is inadmissible.

Condemnation proceedings by the board of water supply of the city of New York. On objection to confirmation of the award of the commissioners appointed to fix compensation for land taken for the Ashokan Reservoir, section 3. Award confirmed in part, and rejected in part.

Francis K. Pendleton, Corp. Counsel (John J. Linson, of counsel), for the motion.

Joseph A. Flannery, Jerome H. Buck, A. C. & F. W. Hottenroth, James P. McGovern, Oliver P. Carpenter, and Arthur A. Brown (Harrison T. Slosson and Edward A. Alexander, of counsel), for various claimants.

BETTS, J. On or about April 15, 1907, the board of water supply of the city of New York, by its president, verified a petition reciting various statutes in relation to providing the said city with an additional supply of pure and wholesome water, for the acquisition of lands or interests therein, and for the construction of the necessary reservoirs, aqueducts, etc., for that purpose, and the proceedings of various bodies thereunder. Said petition alleges compliance on the part of said city and petitioner with said statutes, and a filing on February 19, 1907, in Ulster county clerk's office, of a map upon which there is laid out and numbered the parcels of real estate on which it is necessary to construct and maintain the reservoir, and which it is necessary to acquire for the prosecution of the work authorized by said act, and that all of said parcels are to be acquired in fee. The petition further recites that:

"The board of water supply further shows that the real estate to be acquired herein is necessary for the purpose of constructing, maintaining, and operating the reservoir, aqueduct, culverts, sluices, tunnels, and the various appurtenances for the purpose of conveying water to the city of New York."

And the following is a description of all the real estate to be acquired on behalf of the city of New York, for the purposes of this act, in this particular proceeding, as shown on the map hereinbefore referred to. Each of the parcels is to be acquired in fee, the title to vest in the city of New York as prescribed by law. Then follows a description of the several parcels of real estate desired to be taken, by a separate description of each. The petitioner further alleges that it has taken all the steps and discharged all the duties imposed upon said board of water supply to entitle the petitioner to the relief prayed for. Wherefore it asks, for and on behalf of the city of New York, and for the purpose of vesting the fee of the lands in said petition described in said city, that the court make an order for the appointment of three disinterested and competent freeholders to ascertain and appraise the compensation to be made to the owners of and all persons interested in the real estate laid down on said maps as proposed to be taken or affected for the purposes indicated in said act, and to exercise and discharge all the powers and duties conferred upon commissioners of appraisal by said act, or the acts amendatory thereof or relating thereto.

Upon said petition on the 20th day of April, 1907, the court appointed three commissioners herein to ascertain and appraise the com-

pensation to be made to the owners of and all persons interested in the real estate laid down on said map in this proceeding filed in the said clerk's office as aforesaid, as proposed to be taken or affected for the purposes indicated in said act, and to exercise and discharge all the powers and duties conferred upon them under chapter 724, p. 2027, of the Laws of 1905, and the acts amendatory thereof and relating thereto. On or about the 23d day of November, 1907, the said commissioners made a first separate report of 19 parcels of said real estate so referred to them, and the matter came on before this court for a hearing on the motion of the corporation counsel of the city of New York for confirmation of the same on the 21st day of December, 1907. On that hearing no objection was made to the confirmation of the report as to 5 parcels, and the report of the commissioners thereon was confirmed. As to the remaining 14 parcels objections were made, and the report as to those parcels is here for confirmation or otherwise on the part of this court.

This real estate described in the petition herein is sought to be obtained by virtue of the right of eminent domain, exercised by authority granted by the Legislature by taking a large number of parcels of real estate in this county for the purpose of making a large reservoir thereon for the accumulation and storage of water for the use principally of the inhabitants of the city of New York to be conveyed to said city by a monster aqueduct on lands acquired by the same method. The right of eminent domain is the right of the state as sovereign to at any time take the private property of any citizen for public use by paying just compensation therefor. As stated by Judge Vann, of the Court of Appeals, in People v. Adirondack Railway Company, 160 N. Y. 225, 237, 54 N. E. 689, 692:

"The power of eminent domain is the right of the state, as sovereign, to take private property for public use upon making just compensation. The state has all the power of eminent domain there is, and all that any sovereign has, subject to the limitations of the Constitution. Although exercised under our first Constitution, it is not mentioned therein, and it is now mentioned only for the purpose of limitation. The language of the Revised Constitution is as follows: 'No person * * * shall be deprived of life, liberty or property without due process of law; nor shall private property be taken for public use, without just compensation.' And 'when private property shall be taken for any public use, the compensation to be made therefor, when such compensation is not made by the state, shall be ascertained by a jury, or by not less than three commissioners appointed by a court of record, as shall be prescribed by law.' Const. art. 1, §§ 6, 7. This language, which presupposes the existence of the power outside of the Constitution, simply regulates the right to use it. It does not confer the power, but, recognizing its existence, surrounds it with proper limitations."

The right of eminent domain is older than our Constitution and is inherent in all governments. Gardner v. Village of Newburgh and Others, 2 Johns. Ch. 162, 7 Am. Dec. 526 (1816); People v. White, 11 Barb. 26. It is now restricted in this state by constitutional provision (section 6, art. 1): "Nor shall private property be taken for public use without just compensation." The decisions are that this compensation is to be paid the landowner for the fair and reasonable market value of his property at the time of the appropriation by the condemning party, which in this case was on the 9th day of May, 1907;

and such property is to be considered for all purposes for which it
can be advantageously used by the owner, and its value is to be taken
as to the owner, and not as to the condemning party. Mills on Emi-
nent Domain (2d Ed.) § 168. The theory upon which it is taken at
all is that the right of the individual must give way to the greater
rights of a majority of the subjects of the state, and that it is necessary
for the public use. Said Chief Justice Fuller, of the United States
Supreme Court, referring to the right of eminent domain:

"That right is the offspring of political necessity, and is inseparable from
sovereignty, unless denied to it by its fundamental law. It cannot be exer-
cised, except upon condition that just compensation shall be made to the own-
er; and it is the duty of the state, in the conduct of the inquest by which
the compensation is ascertained, to see that it is just, not merely to the
individual whose property is taken, but to the public which is to pay for it."
Searl v. School District, 133 U. S. 553, 562, 10 Sup. Ct. 374, 33 L. Ed. 740.

Justice Field also said in Garrison v. City of New York, 21 Wall.
(U. S.) 196, 204, 22 L. Ed. 612:

"The proceeding to ascertain the benefits or losses which will accrue to
the owner of property when taken for public use, and thus the compensation
to be made to him, is in the nature of an inquest on the part of the state,
and is necessarily under her control. It is her duty to see that the estimates
made are just, not merely to the individual whose property is taken, but to
the public which is to pay for it."

The condemnation of private property for public use is not intend-
ed to benefit the individual owner, nor is the condemning party called
upon to pay the owner for advantages which may accrue to it by rea-
son of the location of its property. It is not the advantage to New
York City, but the detriment to the landowner, that must be paid for.
B. R. & M. R. Co. v. Barnard, 9 Hun, 106; Matter of N. Y., L. & W.
R. Co., 33 Hun, 639. Information (by the commissioners in assessing
damages) may be collected in all the ways which a prudent man usu-
ally takes to satisfy his own mind concerning matters of the like kind,
where his own interests are involved in the inquiry. They may seek
light from other minds, that they may be the better able to arrive at
just conclusions; but at the last they must be governed by their own
judgment. 15 Cyc. 899; Matter of Daly v. Smith, 18 App. Div. 194,
45 N. Y. Supp. 785; Matter of Board of Water Commissioners, 71
App. Div. 544-555, 76 N. Y. Supp. 11. In all cases the value must
be actual, not speculative. Randolph on Eminent Domain, 228; 15
Cyc. 895. "And, generally, remote and speculative inquiries should
be excluded." 2 Lewis on Eminent Domain (2d Ed.) 1059; Searl v.
School District No. 2, 133 U. S. 564, 10 Sup. Ct. 374, 33 L. Ed. 740.

The damages to the landowners, or claimants, as they are called in
this proceeding, are to be fixed for the market value of the real es-
tate taken for its best available uses to claimants, and for all purposes
for which it is, or reasonably may be used. Various kinds of objec-
tions were filed by attorneys for the different claimants in this pro-
ceeding, and I shall proceed to discuss them briefly in a general way,
giving reasons for the determination made.

One of the objections is that the commissioners as to certain
parcels excluded testimony offered in behalf of the claimants as to the
gross receipts of business and net income from business conducted up-

on the parcels of land condemned in this proceeding. This applies to several parcels. We have seen, from the petition and order, that this commission was appointed to award compensation to claimants for the real estate taken; and this is in accordance with the statute. The statutes also provide, under certain conditions therein stated, that the owner of an established business on June 1, 1905, directly or indirectly decreased in value by reason of the acquiring of land by the city of New York for an additional water supply, his heirs, or assigns, or personal representatives, shall have a right of damages for such decreased value; that the board of water supply may agree with such person as to the amount of such damages, and in case such agreement cannot be made such amount of damages shall be determined in the manner herein provided for the ascertainment of the value of real estate taken. Section 42, c. 724, p. 2050, of the Laws of 1905, as amended by section 9, c. 314, p. 744, of the Laws of 1906.

It is claimed on behalf of the city of New York that this commission was appointed for the purpose of determining the value of the real estate taken, or the injury or depreciation of real estate injured and not taken, but part of the original lot or parcel; that this commission has nothing to do with the fixing of damages for loss or decrease of business; that that must be the province of a separate commission or commissions; and the court thinks this contention is right. This commission was appointed solely with the view of determining the value of the real estate and the injury thereto to the claimant, as disclosed by the petition, the order appointing the commissioners, the report of the commissioners, and the statutes relating thereto; hence the evidence offered in relation to such loss or decrease in business, or to the extent of the business carried on by the parties on said real estate, either the owners or tenants thereof, was properly rejected. In addition to the reason of an entire lack of jurisdiction on the part of the commission is the fact that in all the cases submitted here the parties were still doing business upon the property, as they had been doing for the respective terms during which they had occupied the real estate sought to be condemned, and carried on the business for the loss or decrease of which they sought remuneration; hence there was now no loss or decrease of business. "Damages can be assessed only to property described in the petition." 15 Cyc. 895; Thayer v. County Commissioners, etc., 10 Cush. (Mass.) 151.

The same rule applies to the attempt to prove loss to personal property or private property owned by the claimants here on some of these real estate properties condemned in this proceeding. This personal property is not taken by the city of New York, and it does not propose to take the same. It is still in the possession of the owner. Personal property is by its nature highly perishable, and it may very well be that by the time the parties are ready to move to some other place much of the personal property belonging to the claimants will have entirely disappeared, been lost, or worn out by use. Manifestly the city should not be required to pay for such property. If parties remove only a short distance, and carry on the same business they are now conducting, their business may be better instead of worse, in-

creased instead of decreased, so that claimants will be content and satisfied with their new conditions, and will not be put to the trouble and expense of presenting claims to any commission for either private personal property or loss or decrease of business.

Considerable argument was had on the submission of the report of the commissioners as to the admissibility of evidence of structural value of the buildings and erections upon the lands condemned. This question is not before me at this time, because on the application of the claimants such evidence was admitted by this commission over the objection of the city, and undoubtedly was considered by the commissioners as an element of damages to the claimant. The city now moves for confirmation of the report, despite such evidence having been admitted against it over its objection. If the commissioners did not give to such evidence the importance claimed for it by the landowner, it is difficult to see how the city is blameworthy for that fact. The claimants allege that it was not given sufficient weight, because in some cases structural value, as testified to by the witnesses for both parties, added to the city's value of the land without any improvements, is greater than the amount of the award. The claimants lose sight of the importance of the examination of the premises made by the commissioners. There is no such disparity in the items claimed as to cause the court to set aside the award for the reasons suggested. It is also urged that a separate report should be made as to the structural value of the buildings upon these several properties, so that claimants may know just how much weight in each case the commission gave to testimony of that kind. Nothing could be gained by such a report. All these structures are a part of the real estate, and a separate report on each structure, as was asked for by one of the claimants, would simply tend to confusion.

Objection was made that there is no separate report on quarry property contained on or in the land of some of the claimants in this section. There should be no such separate report. The greatest latitude was allowed the claimants as to the nature of the stone quarries and the real or supposed extent of the quarry by the commissioners. Unquarried stone in a quarry is real estate, and is properly included in the single award made. Stone that has been taken out of a quarry is personal property, and is not taken by the city, and, of course, should not be paid for. The claimants might as well ask for a separate report of the value on each currant bush or corncrib. They are all a part of the real estate, and properly included therein. "The compensation should be estimated for the land as land, and not for the materials which compose it." 2 Lewis on Eminent Domain (2d Ed.) 1077; Water Commissioners v. Lawrence, 3 Edw. Ch. (N. Y.) 552. Nor can there be any claim, where a quarry is taken, for loss of an established business, or decrease in the value or amount of the same, as the quarry is taken by the city of New York and paid for as part of the real estate. Working a quarry simply turns into money a portion of the real estate; hence depreciates the value of the real estate, so that, having been awarded damages for the entire real estate, including the quarry there is no business to be decreased.

One of the attorneys, Mr. Buck, alleges unjust discrimination on the part of the commissioners against his client's properties. A careful examination of the matter leads me to the conclusion that such allegations are entirely unfounded. Two affidavits relating to such allegations were handed up without reading on the hearing before me, and I said that I would decide whether they would be received on an examination of them. These affidavits are simply attempts to get before this court the affiants' idea of the relative values of real estate in this section 3. Such evidence was not competent before the commission, and is not competent before this court, and will not be considered on this hearing. It has been used by me simply as a brief of the claimant and as setting forth his contention.

Another objection is made to the action of these commissioners, in that they have not admitted evidence of what has been referred to in a general way as the availability and adaptability of certain of these properties for reservoir purposes, or, rather, of the entire proposed Ashokan Reservoir property, for reservoir purposes. These questions are before me on this hearing in four several parcels, Nos. 85, 90, 94, and 122. It was also raised on the hearing before the commission in parcel No. 89; but the report of the commissioners as to parcel No. 89 was confirmed on the hearing herein, not being objected to by the attorney for the claimant. It was also before me in parcel No. 124A; but, as that parcel is returned, or rather, sent to a commission for reasons hereinafter referred to, it is not before me on this question. In all four of these parcels the question came before the commission on an offer to prove certain alleged facts. This is a very unsatisfactory way to dispose of a question affecting so many property owners, as from the nature and form of the offer it is difficult for either a commission or the court to pass so satisfactorily upon it as could be done if the witness was produced and the questions calculated to adduce the information which it is claimed they can establish were in fact asked of such witness, with an opportunity for objection and cross-examination by the opposing attorney, if any evidence admitted.

I shall refer first to parcel No. 85, Elizabeth Hogan, owner, which is a parcel of land containing something over 109 acres, and which has a small stream or rivulet of water on it. A small portion of the lot borders on the Beaverkill, a somewhat larger stream of water, but still small when compared with the Esopus, which eventually empties into the Esopus creek, upon which the Ashokan dam is to be constructed, at a point below the said dam. The nearest point of the Esopus creek to lot 85 is over one mile therefrom, and many different parcels of land belonging to different owners intervene between parcel 85 and the Esopus creek. The place where the main dam is to be built is at a greater distance from the parcel in question upstream. The greater portion of this lot 85 is within the proposed reservoir. The question was presented to the commission on an offer of Mr. Slosson, the attorney for Elizabeth Hogan, as follows:

"Mr. Slosson: I offer on behalf of the claimant to prove the following facts: First, the availability and adaptability of this property for reservoir and water supply purposes; second, the demand for this property by the city of New York for water purposes; third, the character, quality, and

volume of water furnished by the Ashokan and its tributary reservoirs; fourth, the cost of this supply, its value to the city of New York, and the value of this particular piece of property to New York City as a part of its reservoir system; fifth, the capacity of this parcel in relation to the whole storage capacity of the Ashokan Reservoir; sixth, the fact that this reservoir is the most accessible, cheapest, and best obtainable supply of water for the city of New York."

It was objected to by Mr. Linson, on behalf of the city of New York, as follows:

"First, that it is improper; second, that it is immaterial; third, that it is irrelevant; fourth, that it is incompetent; fifth, that the evidence is immaterial and irrelevant, specifically in that it appears by the petition forming part of the record upon which this commission was appointed, and of which it must take judicial notice, that the parcel of land in question forms a part of the premises which have been selected by the proper authorities of the city of New York for the purpose of gaining a new and additional water supply for the city, and therefore it is conclusively presumed that the same is adapted to the purposes for which it is desired, and, that being so presumed, it can neither be added to nor subtracted from by proof; sixth, that the evidence is improper, in that it assumes that the measure of damages in cases like this is the value of the property to the condemning party, and not the value of the property in the hands of the owner; seventh, that the evidence is improper, in that it is speculative, because it appears by the record before the commission that the property in question to be acquired is one of a large number of parcels belonging to a large number of different persons, and the owner of the parcel in question has no way of compelling the concurrence of the other property owners with her in building or constructing a reservoir, or furnishing a supply of water for the city of New York, or for any other place."

The commission sustained the objections to the admission of the evidence by the following decision:

"After consultation the commission have determined to deny the claimant's application to introduce this testimony, on the ground that the only purpose for which it would be admissible would be to show the availability and the desirability of this property for reservoir purposes, and that the petition under which the proceeding has been instituted contains an admission on the part of the city that it is the most available and the most desirable and the best adapted for furnishing an additional supply of pure and wholesome water to the city of New York. I might add that the commission holds that it has a right to take that admission into consideration in determining the amount of damages to which the claimant would be entitled."

Both parties excepted to this ruling of the commission. The commission was right in declining to receive evidence of its value to the city of New York. Section 3, c. 724, p. 2028, of the Laws of 1905, as amended by section 1, c. 314, p. 736, of the Laws of 1906, contains this clause:

"Provided, however, that no reservoir, or other structure for the storage or impounding of water, shall at any time be constructed within the drainage area of the Esopus creek in the county of Ulster, other than that designated in the reports of William H. Burr, Rudolph Hering, and John R. Freeman to the Honorable George B. McClellan, mayor, chairman board of estimate and apportionment of the city of New York, as to the Ashokan Reservoir, the flow line of which shall not exceed elevation six hundred feet coast and geodetic survey datum."

It was argued by some of the claimants here that this section of the statute pre-empted the proposed Ashokan Reservoir site for the use of the city of New York, and hence the claimants should be for that

reason permitted to prove the value of the reservoir site to the city of New York, as there could be no other purchaser. This is not a true construction of the section, as, if it were, it would be clearly unconstitutional by taking the claimant's lands without compensation. It is really a restriction upon the city of New York, and no restriction whatever upon the landowners. It permits the city of New York to condemn only the portion of the Esopus valley referred to in these reports, and restricts it to that portion. The decisions are uniform that a landowner is not restricted in the use of his land subsequent to legislation and prior to a municipality or other condemning body taking action thereunder. After the passage of such statute he is not required to await the uncertain action of the municipality, but may do with his own land as to him seems best.

The second, third, fourth, fifth, and sixth offers were all properly rejected by the commission for the reason that they all refer to the reservoir that is proposed to be created by the city of New York upon the Esopus creek and the value to the city of the parcel 85. That leaves the question as to the first offer, the availability and adaptability of this property for reservoir and water supply purposes. In the argument it was stated upon behalf of parcel 85 that:

"The purpose of offering this testimony was to show, by contrasting the cost of storing 127,000,000,000 gallons of water in this reservoir with what it would cost to store the same quantity of water under ordinary conditions, on the theory that any advantages that this property was possessed of by reason of its natural adaptability and availability for water supply purposes should accrue to the owner of the property, rather than to the condemning party. If claimant had been permitted to show the cost of this reservoir, and the increased cost of storing this amount of water in a reservoir of the same capacity under ordinary conditions, the difference would amount to a saving in the cost made possible by the peculiar adaptability of this site for the construction of a reservoir of its enormous capacity. This advantage, or this difference in cost, this saving, it would seem, must accrue to the owner as part of his property. He should be permitted to reap the benefit thereof, instead of the city of New York."

As is said in the objections on behalf of the city of New York, the fact that the city comes to this section for this water makes out prima facie a case that the water and site are both adaptable and available to New York City for its desired increased water supply, so that from the petition, which is uncontradicted, and which stands before this commission and the court as the complaint, that fact may be considered conclusively established. It may very well be that the property owner would not be concluded by the statements and allegations in that petition, and it may be desirable that the landowner should (so far as appears from this simple question) have an opportunity of showing that everything that is connected with the desirability of his property for a reservoir site is not contained in the petition filed herein; so it is necessary for the court to put itself in the position of the commission at the time that this evidence was offered, in order that the reason for the ruling may appear. These commissioners were men thoroughly familiar with the location. They were appointed in April, two of them residents comparatively near to the property. They had made many visits there, and this offer was made October 21, 1907;

so that the commissioners had nearly six months to familiarize themselves with the locality of the proposed dam and reservoir and its relative location to the city of New York. This section has some 50-odd parcels in it. There will be in the land taken by the Ashokan Reservoir, I am informed, about 1,000 parcels of land. Many of these parcels have more than one owner; one before me has eight tenants in common. Many others of them have lienors, tenants, and different interests connected with them, which must be acquired by any person desiring to create a reservoir there. There are easily an average of two persons interested in each of those parcels of land. In order to make this parcel 85 available as a reservoir, the consent of these other owners or persons interested must be obtained. Many of these owners are persons under age or otherwise incompetent, and from the nature of things could not consent, nor would any one be authorized to consent for them, with the owner of parcel No. 85, that this whole section should be made into an immense reservoir. The tract—the whole proposed reservoir site—contains numerous cemeteries in which deceased persons have been interred. Such properties are inalienable, and no one could give consent to their forming part of a reservoir site. In addition, there are many schoolhouses and churches, the owners and congregations of which, it is reasonable to assume, would embrace people residing outside of the reservoir district whose consent would have to be obtained to the use of this property for a reservoir site, and in some instances legislation would be necessary. There are miles of public highways in this section, which require statutory authority to close for the purpose of a reservoir site, and to close which would require the consent of many people outside of the reservoir district.

Recollecting that there is no water upon this parcel of land which is available for filling such a reservoir as is contemplated in the offer here, recourse must be had to the Esopus creek, which runs through this immense proposed reservoir site, containing some 8,000 acres, and from which stream and its tributaries the water for filling this dam is expected to be obtained; so, even after having obtained the consent of the riparian owners along this Esopus creek in the proposed reservoir section for the construction of this reservoir, there is still no water available to fill it. "Running water in natural streams is not property, and never was." City of Syracuse v. Stacey, 169 N. Y. 231, 245, 62 N. E. 354, 355. Hence these riparian owners do not own the water in the Esopus. The Esopus creek empties into the Hudson river some 25 or 30 miles below where the city of New York proposes to erect its dam, or where, if a combination of the owners of land was effected, their dam would be erected. Each of the riparian owners on each side of that 25 or 30 miles of stream has a right to the use of this water in the way in which it is now running and always has run. So the consent of all of these riparian owners would be necessary to construct a similar dam, or any kind of a dam which would impound the large body of water which is proposed to be impounded here. Easily 1,000 people, and probably many more, would be interested in that proposition. If their consent was obtained, and the dam con-

structed, and the water impounded, still so large a body of water is not successfully marketable by the glass, pail, or car load. There is only one market for it, and that is the city of New York, some 90-odd miles distant. Assume that the consent of all those parties owning lands through which the proposed aqueduct is to run could be obtained to the construction of an aqueduct similar in its nature to the one that is proposed to be constructed by the city of New York, another army of people must be consulted with, probably other infants and incompetents, who cannot consent, so that many hundreds of people more would be required to give their consent to this proposed dam, as about 200 parcels are in the Ulster county division of the aqueduct. The offer on the part of Elizabeth Hogan does not contain any statement that she is able, ready, and willing to furnish the millions of dollars required to erect this dam and aqueduct, pay these riparian owners, and carry this water to New York, so that something more than consent is necessary. For these reasons, among others, it seems to me that the attempt to show that this great proposed reservoir and aqueduct could have been constructed by any possible combination open to the residents and landowners there before condemnation by any suggested method that has come to my attention seems entirely the product of a fertile imagination, or that (which is the true test) such a proposed combination and construction, or the right to combine and construct, could have added in any way to the market value of a farm, wood lot, residence, or building lot in section No. 3, is altogether unlikely. It seems fanciful and speculative in the extreme. Nothing approaching it has been called to my attention.

An English case has been cited (In re Arbitration between the Mayor, etc., of Tynemouth and the Duke of Northumberland) where three persons were the owners of separate parcels of land suitable and about to be condemned for reservoir purposes. Neither parcel was suitable for an entire reservoir, but the three together were. The arbitrator in England allowed compensation for the availability of the site of one owner, which award was confirmed by the court; and from that it is argued here that the matter of a few people more or less do not make much difference, and, if three separate owners could be considered, the necessary thousands here could. But that case is nothing like this case. As I understand it, it was land and a stream that was taken for commercial or power purposes, the water to be stored for use along the Font river lower down. It appeared that the Duke of Northumberland's land was upon one side of and adjacent to the Font river, and at the point where the dam was to be constructed. The arbitrator held that the same rate per acre should not allowed to each claimant; that is, that they should not prorate the amount of land and the damages therefor (which is the proposition here), some being of greater value than the others.

The principal case cited by the claimants in this state is Matter of Gilroy, 85 Hun, 424, 32 N. Y. Supp. 891, in which the court held as follows:

"The principal question presented by the appeal from the order confirming the report is whether the commissioners did not adopt an erroneous measure

of damages in excluding from consideration, as an element in the market value of the property to be taken, the existence of any demand for such property on the part of the city of New York. The record plainly shows that they proceeded upon the theory that the existence of any such demand could not be considered as an element of market value. So far as the rule which they followed was merely a decision that the desirability of the particular property to the city, in view of its necessities, was not the legal measure of damages, it was correct. The commissioners went much further than this, however, and practically held that the availability of the property for use in connection with the water supply of New York City could not be taken into account by them in determining what was the fair market value of the premises. In so doing it seems to me. they disregarded the great weight of authority as to the proper measure of compensation in cases of this kind. * * * Without further citation of authorities, I think it is sufficiently clear that the commissioners in the case at bar erred in excluding from consideration an essential element in the market value of the property, under consideration—that is to say, its adaptability to furnish a portion of the water supply of the city of New York. It follows that their report should be set aside."

In order to understand this case it is necessary and essential to understand the facts that were before the court. The land sought to be condemned by the city of New York was a portion of Lake Gilead, in Putnam county, upon the west branch of the Croton river. The claimants were five women, tenants in common, the heirs at law, descendants, and devisees of one Adolph Philipse, or his descendants, to whom said lake and other lands was conveyed by patent from King William III in 1697, and the property had been in the family ever since. The claimants owned 120 acres of the upper part of said Lake Gilead, and the city of New York had acquired 2 acres and 10 rods of the lower part of said lake, including its outlet. The 122 acres and 10 rods comprised the entire lake. By chapter 256, p. 451, of the Laws of 1834, which was "An act to provide for supplying the city of New York with pure and wholesome water," certain commissioners were authorized to be appointed, to be known as "water commissioners of the city of New York," and they from time to time acquired portions of the Croton watershed. This act was further amended by chapter 306, p. 298, of the Laws of 1841, which provided for the completing of the Croton Aqueduct and a distributing reservoir at Murray Hill, in the city of New York. From that time on down until the commencement of the proceedings to acquire the remainder of Lake Gilead in 1891, for half a century, the city of New York had constructed the large Croton dam, which forms the Croton Lake, on the Croton river, about 10 miles downstream from Lake Gilead, and from time to time the city had purchased and leased various lakes and ponds, and constructed dams and reservoirs thereon, throughout the higher parts of Putnam and Westchester counties; so that some 50 years thereafter, when this proceeding came to be started, it became fairly well known that lakes and ponds of fresh water were desirable property to hold in that section above the Croton Reservoir, as it was likely to be desired by the city of New York, and a good price realized thereon, and a market value for such property was created. The city of New York had also used for some time the water of this Lake Gilead, so that at the time these proceedings were commenced, before and while they were pending, this desire on the part of New York City for an ad-

dition to its water supply, it can easily be seen, had affected the mar-· ket value of properties of that kind. Reading the decision in the light of the questions before the court, we can see that what was shut out by these commissioners was the market value of this property, a value which had grown up with the years, and which had increased by the parties holding this lake for this long term. All the city of New York had to do, upon acquiring that lake, was simply to raise the gates, and the water flowed in the natural stream down and into the large Croton Reservoir, so that the conditions there were entirely different from what the conditions are here. As we have seen, this lot 85 has no lake, and no appreciable amount of water upon it. Part of the lot is within and part below the proposed reservoir.

Referring back to the suggestion in regard to the cost of storing 127,000,000,000 gallons of water under ordinary conditions: The commission had confronting them the question whether there could be any such immense volume of water stored under ordinary conditions, or what would be the ordinary conditions of storing that amount of water. In the first place, there was no such reservoir pointed out to the commission, and manifestly there could be no ordinary conditions, with the average usual cost of a reservoir of that size, because the cost of sites of such an immense reservoir would vary as much as the sites would vary, and manifestly no two sites for a reservoir of that size would be alike. "Adaptability must not hinge upon the expenditure of money by the owner, nor upon the assistance of outside parties." Randolph on Eminent Domain, 288; Matter of New York, Lackawanna & Western Railroad Co., 33 Hun, 639. Testimony was received in this case, which was an elevator case, with relation to the earnings of other elevators and the probable amount that could be earned on the property sought to be condemned, provided the property in question was improved and built upon; and the court says:

"The references made to the earnings of other elevators, first-class elevators, with a view of proving the income of the property in question, after its capacity is increased by the expenditure of the necessary amount for that purpose, is not a reliable or approved basis for an estimate of value; but it becomes matter of speculation, dependent on too many circumstances, to be entitled to consideration as evidence of value. And the same may be said of contemplated relation to and operation with other property and projects in view, for connecting facilities with channels of transportation not within the control of the owner of the property in question. Burt v. Wigglesworth, 117 Mass. 302–306; Gardner v. Brookline, 127 Mass. 358, 362; In re William, etc., Streets, 19 Wend. 690; In re N. Y., L. & W. Ry. Co., 27 Hun, 151, 154."

In Moulton v. Newburyport Water Company, 137 Mass. 163, the headnote is as follows:

"The measure of damages for taking land on the side of a stream by a water company is the fair market value of the land at the time it is taken, and not its market value as a storage basin to the company, or as such a basin for supplying the town in which it is situated, or other adjacent towns, with water by pipes carried thereto."

In Matter of Daly, 72 App. Div. 394, 76 N. Y. Supp. 28, the headnote is as follows:

"In a proceeding by the city of New York to acquire the right of a person entitled to use, for mill purposes, the outlet of a lake, desired by the

city for the protection of its water supply, evidence of the value of the defendant's right with reference to the utility of the lake as a water power is competent; but evidence as to the value of such right with reference to the utility of the lake for storage purposes, or as to the value of the water of the lake to the city, is incompetent."

From an examination of these and all the cases cited to me by the landowners, and many others examined, not cited nor referred to by me, I think that the ruling of the commission was correct. It may be suggested that some of the matters that I have referred to here, such as the comparative number of persons who must unite to make the proposed reservoir here, is not before the commissioners. This is true, so far as testimony goes. It was not proven; but they are matters of common knowledge, easily within the knowledge of all the commissioners, who are intelligent men, conversant with the situation, and conversant with the locality, the geography and topography of the situation of this reservoir, and which they were very likely to have in their minds, influencing them in the decision made, and which would have to be faced by landowners if proposed testimony was allowed. The commission was extremely careful and patient to allow the landowners in every case to go into the most minute detail as to the parts of buildings, the trees, buildings, and shrubs, lumber, stone quarries, and streams on the various parcels of land, the nature of the soil, to what it was adapted, its location, and practically everything that would interest a proposed purchaser making prudent inquiries, or that a seller, desirous of giving to the proposed purchaser the fullest and most favorable description of his property, would be likely to tell him.

In parcels Nos. 90, 94, and 122 the evidence had all been taken and the case closed when, about November 13, 1907, shortly before the commission reported, a motion was made to reopen the cases and to introduce evidence concerning this same availability and adaptability, which motion, after argument, was denied by the commission. I am not disposed to interfere with the action of the commission in this matter. In the first place, it was a matter of discretion with them as to whether they were sufficiently impressed by the arguments of the persons making the motions to permit the cases to be reopened. With such discretion courts will not interfere, unless the same has been abused. In the second place, the commission decided in the light of their previous decision in lot 85, and in the light of the argument submitted. I think the decision is correct. Lot 122 is entirely below the proposed reservoir dam, so that much of the evidence claimed to be material as to the reservoir site for storage of water would not apply to it, and the greater portion of lot 90 is also below it. On No. 90 a small rivulet has its source. No. 94 is the next lot upstream on the same small stream that flows through No. 85, and No. 122 has no stream. They are all of them some distance from the Esopus.

In regard to the 13 parcels exclusive of 124A, I have decided to confirm the report of the commissioners in accordance with the general rule in cases of this kind, which is that, unless the award is palpably excessive or inadequate, it will not be set aside on that ground, or unless it appears that the commissioners adopted an erroneous principle in determining this amount. 15 Cyc. 908; Matter of Collis,

76 App. Div. 368, 78 N. Y. Supp. 495. "Under the general laws applicable to the city of New York in street opening cases, and under the general railroad act of 1850, and numerous other acts, commissioners of estimate and appraisement are required to view the lands in reference to which their action is invoked, as well as to receive evidence. They are selected for their supposed competency to deal with the matters submitted to them, and are impartial, and generally they must be as well qualified as any three witnesses to form a judgment, from their personal view and examination, of the damages which ought to be awarded. The basis upon which damages are to be estimated is frequently very uncertain, and estimates of friendly witnesses upon questions of value and damage must frequently be prejudiced, uncertain, and unreliable; and hence it is a wise provision of law which requires the commissioners in such cases to view the premises and take ocular proof of their condition." Allen A. Perkins v. State of New York, 113 N. Y. 660, 21 N. E. 397.

In parcel 90 the commission had no jurisdiction to determine the question submitted by the United States Award & Assessment Company.

In regard to parcel No. 124A, Jerome H. Buck, owner: This is a parcel of land, originally containing about 64 acres, of which the city takes 52.869 acres, leaving something over 11 acres not taken. Considerable confusion crept into the proceedings during the hearing of this case. Amongst other objections urged by the claimant is:

"That the commissioners erred in receiving evidence of benefits to the portion of the property not taken, by reason of a road, which, it is claimed, the city means to construct along the property not taken."

The testimony is that this 11 acres that will be left to the owner is without access to any highway. It was suggested during the hearing that under the act the public highways were not to be closed until actually necessary for the use of the work of the city; but that would not help this owner any, as the highway does not reach to his land. Upon the confirmation of the report of this commission, or upon the city paying or depositing one-half of the assessed value in 1905, it is entitled to the possession of the 52.869 acres, so that the owner of the 11 acres could not reach his property without trespassing upon some party's land. Over the objection of the claimant the city was permitted to prove that, if there was a public highway running along the 11 acres, the value of said 11 acres would be much greater than was testified to in the condition in which it would be left by the taking of this parcel actually taken. The map filed shows a proposed road, and the statute provides:

"The city of New York is hereby required to build and construct such highways and bridges as may be made necessary by the construction of any reservoir under this act, and to repair and forever maintain such additional highway bridges. * * *" Section 35, c. 724, p. 2048, of the Laws of 1905, as amended by section 6, c. 314, p. 741, of the Laws of 1906.

From the evidence offered and the rulings of the commission it is difficult to state just what the decision of the commission was in this matter. The report does not refer to it. There is some embarrassment in the case, in that ordinarily such a matter would be sent back

to the same commissioners for them to report fully what their decision was; but Commissioner Henry Smith has resigned and entered into the service of the city of New York as its commissioner of parks, so that he is not eligible now for appointment as a commissioner in this proceeding. The property owner is entitled to know just what is held or determined by these commissions in regard to his property. The rule is reasonably clear that in a case of this kind the measure of damages to the owner would be the difference in value between the value of the entire property as it was before the taking and the value of the 11 acres that is left to the owner, in the condition that it is left at the time, considering any injury that is done to it by the taking, such as its isolation from the highway. South Buffalo Ry. Co. v. Kirkover, 176 N. Y. 301–306, 68 N. E. 366. The cases cited by the city of New York, that benefits accruing to the landowner of this 11 acres could be allowed the city, do not apply, for the reason that those cases cited all are where the improvement for which the property was taken benefited the remaining property. There is nothing sufficiently certain and definite as the case appearing before the commission to say, if ever, when this road will be made. The statute does not provide that a road shall be made around the taking line of this reservoir, and the city may conclude to put it elsewhere. In the meantime the landowner is unable to get to his land without trespassing on some party, and he should be compensated therefor; hence this parcel and the claim made therefor will be sent to a commission, consisting of George H. Smith, Josiah J. Hasbrouck, and James Renwick Sloane of New York, the present commissioners of appraisal for this section No. 3, under the same powers as were originally granted to the commissioners in this matter.

I think I have now covered in some measure, in an opinion altogether too long, all the various objections that were made to this report.

The commission allowed or recommended no costs as such to the various claimants. An application is made to me to tax to the claimants certain bills of costs. Justice Mills, in the Matter of Section No. 2 of the Catskill Aqueduct, handed down an opinion in July, 1907, in which he refused such costs. I consider his decision and the reason given therefor correct, and I shall follow the same. So no costs are allowed.

Section 13, c. 724, p. 2035, of the Laws of 1905, as amended by section 3, c. 314, p. 739, of the Laws of 1906, provides that:

"They [the commissioners] may also recommend such sums, if any, as shall seem to them proper to be allowed, to parties appearing in the proceeding, as expenses and disbursements including reasonable compensation for witnesses."

See section 32, c. 724, p. 2045, of the Laws of 1905.

Under these sections the commissioners have recommended allowances as counsel fee to the extent of 5 per cent., with the exception of three cases, where the amount of the award exceeds $5,000. Without intending to establish the precedent that there may not be cases in which the allowance of 5 per cent. for counsel fees would be too great, even where it did not meet the prohibition of the statute, still I think,

in each of the cases examined in this section, 5 per cent. should be allowed; and the recommendation of the commissioners is not followed in that respect, but 5 per cent. is allowed in all cases. The commissioners' other recommendations for expenses and disbursements, including reasonable disbursements for witness fees, are allowed in every case except 124A.

An order may be entered in conformance herewith.